## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| ANDREA BELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:06-cv-00223-SRW |
| | ) | |
| O'REILLY AUTOMOTIVE, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant O'REILLY AUTOMOTIVE, INC. ("O'Reilly") submits this *Brief in Support of Motion for Summary Judgment* seeking judgment on the claim filed by Plaintiff Andrea Bell ("Bell") under the Pregnancy Discrimination Act amendment of Title VII of the Civil Rights Act of 1963 ("Title VII"), 42 U.S.C. § 2000e(k). O'Reilly shows unto this Court that there are no genuine issues of material fact, and Bell's claim is due to be dismissed as a matter of law.

### I.    Summary of Undisputed Facts

O'Reilly is a retailer and wholesaler of aftermarket auto parts headquartered in Springfield, Missouri. *Affidavit of Emily Buchholz* (Exhibit "A"). O'Reilly is an equal opportunity employer which does not discriminate against its employees or applicants for employment on the basis of race, gender, religion, disability, or any other protected characteristic. *Id.*

### A.    Bell's Work Restriction.

Bell became employed with O'Reilly in February 2005 as a Delivery Specialist at Store No. 1126 in District 109 in Montgomery, Alabama. *Affidavit of Emily Buchholz; Andrea Bell*

*Deposition* at page 56, lines 19-21 (*Andrea Bell Deposition* excerpts attached collectively hereto as Exhibit "B"); *Affidavit of Dolan E. Golden, Jr.* (Exhibit "C"). She was pregnant at the time she was hired. *Andrea Bell Deposition* at page 56, line 23; page 57, line 1. As a Delivery Specialist, Bell was required, *inter alia*, to "[d]eliver parts and/or products to installer customers in a safe and efficient manner" and carry and lift between twenty-six to fifty pounds and between fifty-one to seventy-five pounds one to two hours per day. *Affidavit of Emily Buchholz*. She understood the lifting requirements of her job when she was hired, and "was fine" with those requirements. *Andrea Bell Deposition* at page 59, lines 13-23.

Bell contends that when James Wordlaw ("Wordlaw"), former manager of Store No. 1126, found out that she was pregnant, he asked her to get a "doctor's excuse" because he had concerns about her lifting heavy items and he needed to know what she could/could not lift without causing injury to herself and her baby. *Andrea Bell Deposition* at page 61, lines 10-17; page 63, lines 20-23. After learning of Wordlaw's instruction, Melissa Jones ("Jones"), who was Assistant Manager of Store No. 1126 at the time and had recently returned from maternity leave herself, "said it was a good idea that [Bell] was getting a doctor's excuse. . ." *Id.* at page 62, lines 2-17; page 94, lines 10-13; page 95, lines 1-14. Bell then obtained a March 10, 2005 letter from her physician restricting her from lifting more than thirty (30) pounds. *Andrea Bell Deposition* at page 64, lines 5-10; page 69, lines 18-23; page 70, lines 1-7; Exhibit 4.

O'Reilly's policy preventing pregnancy discrimination requires a pregnant employee be able to perform the physical requirements of her job and further provides as follows:

> Applicants and team members who are pregnant when they apply for employment or who become pregnant while employed by O'Reilly Automotive, Inc. will not be discriminated against with respect to hiring, promotion, firing, compensation, or other terms, conditions or privileges of employment and they will not be placed on medical leave if they are able to perform the physical requirements of their job. In the event a pregnancy-related medical restriction impacts an applicant or team

member's ability to perform certain job functions, it will be treated in the same
way as other non-work-related illnesses or conditions.

*Affidavit of Emily Buchholz.* Similarly, O'Reilly's Work Restriction Policy requires, as a general

rule, that employees be able to perform all job functions and physical requirements of their jobs,

or else they will need to take a leave of absence from work. *Id.* The policy further requires that

if an employee is placed on a medical restriction by his/her physician, Corporate Team Member

Relations (a part of O'Reilly's Human Resources Department) should be immediately notified of

the restriction; additionally, if a store manager has reason to believe that an employee cannot

perform his/her job, Corporate Team Member Relations should be notified. *Id.* Unless the

arrangement has been reviewed and approved by Corporate Team Member Relations, store

management is not authorized to permit a team member to continue working with medical

restrictions that interfere with the performance of his/her job. *Id.*

According to Bell, upon obtaining the restriction letter from her physician, she gave it to

Wordlaw and he "put it on file." *Andrea Bell Deposition* at page 64, lines 5-10. However, at

that time and in contravention of O'Reilly's Work Restriction Policy, neither Wordlaw nor Bell

nor anyone else informed anyone in Corporate Team Member Relations or Dolan E. Golden, Jr.

("Golden"), who in March 2005 was District Manager of District No. 109 where Store No. 1126

is located, of Bell's restrictions. *Affidavit of Emily Buchholz; Affidavit of Dolan E. Golden, Jr.*

Instead, when parts were too heavy for her to lift, she would ask for assistance from other

employees and they would then lift those items for her. *Andrea Bell Deposition* at page 82, lines

14-17; page 83, lines 2-4. She required this assistance everyday. *Id.* at page 83, lines 7-8; page

178, lines 11-15. And, when she had to deliver a part that was more than 30 pounds, the

customer would have to unload the part. *Id.* at page 84, lines 17-21. This arrangement violated

O'Reilly's Pregnancy Policy and Work Restriction Policy. *Affidavit of Emily Buchholz.* Still, in

contravention of O'Reilly's Work Restriction Policy, neither Wordlaw nor Bell nor anyone else informed anyone in Corporate Team Member Relations or Golden of Bell's restrictions. *Id.; Affidavit of Dolan E. Golden, Jr.*

Wordlaw ultimately left his employment with O'Reilly Store No. 1126 and Chris McClenny ("McClenny") took over as Manager of that store. *Andrea Bell Deposition* at page 86, lines 1-3; page 87, lines 9-12. Bell claims that McClenny told her that she was going to be moved from a Delivery Specialist to a stock person, and then to the counter to work the cash register because she was getting close to her due date. *Id.* at page 87, lines 2-13. She still continued to work as a Delivery Specialist, however, and McClenny, like the other Store No. 1126 employees, had to assist Bell when lifting heavy items. *Id.* at page 89, lines 9-17; 90, line 23; 91, lines 1-14. McClenny and "Arthur," a co-worker, would load her delivery truck before she went to make a delivery. *Id.* at page 180, lines 17-22; page 181, lines 1-5. This arrangement continued to violate O'Reilly's Pregnancy Policy and Work Restriction Policy. *Affidavit of Emily Buchholz.* Still, in contravention of O'Reilly's Work Restriction Policy, no one in Corporate Team Member Relations or Golden were aware of Bell's restrictions. *Id.; Affidavit of Dolan E. Golden, Jr.*

### B. Bell's Termination.

In June 2005, Jones, again, having recently returned from maternity leave herself, suggested Bell call Corporate Team Member Relations to discuss her maternity leave. *Andrea Bell Deposition* at page 75, lines 3-9; page 94, 6-23; page 95, lines 1-14. Bell called Heidi Enloe ("Enloe"), Team Member Relations Specialist, to inquire as to her leave eligibility. *Affidavit of Emily Buchholz.*[1] Bell states that she was informed by Enloe that if she could "hold off until

---

[1] Bell states that she cannot recall the name of the woman with whom she spoke in Corporate Team Member Relations, although she thinks it was "Peggy, Patty, Pammy." *Andrea Bell Deposition* at page 95, lines 18-21. It

having the baby to a certain time - - make the baby come a different time - - then [she'd] be all right if [she came] back [to work] in forty-five days." *Andrea Bell Deposition* at page 95, lines 18-23; page 96, lines 1-17. **Thus, Bell admits that Enloe informed her during that conversation that if her baby was not born until she had been employed with O'Reilly for six months, she could take a leave of absence and still have a job with O'Reilly**:

> She told me that if I could wait - - if the baby could wait that I would have been there for six months, I believe, if I waited until almost my due date – real due date – August. And then after that if I was back within forty-five days, then I would still have my job.

*Andrea Bell Deposition* at page 165, lines 1-6. Indeed, a forty-two day personal leave of absence is available for O'Reilly employees who have been employed with O'Reilly for at least six months and work an average of twenty hours per week.[2] *Affidavit of Emily Buchholz.* Bell did not tell Enloe about her restrictions during that conversation. *Andrea Bell Deposition* at page 98, lines 6-9.

Enloe relayed her conversation with Bell to Emily Terry Buchholz ("Buchholz"), Team Member Relations Coordinator at that time. *Affidavit of Emily Buchholz.* After speaking with Enloe, Buchholz contacted McClenny to discuss Ms. Bell's inquiry.[3] McClenny informed Buchholz that he had been keeping Bell in the store so as not to make as many deliveries because she had told him that she could not lift the heavier items. *Id.* This arrangement violated O'Reilly's Pregnancy Policy and Work Restriction Policy, and thus, Buchholz advised McClenny to send Bell to her physician with a copy of her job description, so that it could be

---

was actually Enloe with whom she spoke. *Affidavit of Emily Buchholz.* When questioned, Bell agreed that "[i]t might have been Heidi. I don't know." *Andrea Bell Deposition* at page 188, lines 18-23; page 189, lines 1-4.

[2] Bell claims that she worked at least forty hours per week. *Andrea Bell Deposition* at page 172, lines 19-21.

[3] Due to a clerical error, Buchholz's *Affidavit* states "after speaking with Ms. Terry . . .", although it should read, "after speaking with Ms. Enloe."

determined whether her physician had her on any restrictions. *Id.* Still, in contravention of O'Reilly's Work Restriction Policy, no one in Corporate Team Member Relations or Golden were aware of Bell's restrictions. *Id.; Affidavit of Dolan E. Golden, Jr.*

Accordingly, McClenny asked Bell to get a "doctor's excuse," at which time she informed him that "there was already one" in her file. *Andrea Bell Deposition* at page 90, lines 7-9. "And he went in the file, and he found it." *Id.* at page 98, lines 10-21. McClenny then informed Buchholz that he had just learned that Bell was on 30-pound lifting and carrying restrictions. *Affidavit of Emily Buchholz.* Again, up until this time, neither Buchholz nor anyone in Corporate Team Member Relations nor Golden had knowledge of Bell having any work restrictions. *Id.; Affidavit of Dolan E. Golden, Jr.*

As Bell's position with O'Reilly was a Delivery Specialist, which required her to carry and lift between twenty-six to fifty pounds one to two hours per day and between fifty-one to seventy-five pounds one to two hours per day, she could not perform all of the requirements of her position because of her restriction. *Affidavit of Emily Buchholz.* In accordance with O'Reilly's Work Restriction Policy, Buchholz had to determine whether Bell could be placed in a leave of absence status, or whether O'Reilly could accommodate her restrictions. *Id.* Buchholz determined that it was unreasonable for O'Reilly to accommodate Bell's restriction because when other O'Reilly employees had to assist Bell to perform her job duties, those employees were having to perform her job duties, in addition to their own, which could create a significant hardship on the store and on the other Store No. 1126 employees. *Id.*

Buchholz decided, therefore, that Bell would need to be placed in a leave of absence status but unfortunately, she was not eligible for a leave of absence under the Family and Medical Leave Act or under any of O'Reilly's leave of absence policies due to the fact that she

had only been employed with O'Reilly for approximately four months. *Affidavit of Emily Buchholz.* A personal leave of absence is available for O'Reilly employees who have been employed with O'Reilly for at least six months and work an average of twenty hours per week. *Id.* Under the FMLA, Bell would have had to have been employed with O'Reilly for twelve months to be eligible for a leave of absence. *Id.*

Buchholz then advised McClenny to separate Bell's employment, which occurred in June 2005. *Andrea Bell Deposition* at page 66, lines 9-13. Neither McClenny nor Golden nor anyone else had any involvement whatsoever in making the decision to terminate Bell. *Affidavit of Emily Buchholz; Affidavit of Dolan E. Golden, Jr..* **Indeed, Bell admits that shortly after her conversation with Enloe, "the Human Resources lady" gave McClenny the directive to terminate Bell.** *Andrea Bell Deposition* at page 97, lines 22-23; page 98, lines 1-5; page 100, lines 14-16. That decision exclusively was that of Buchholz, made in accordance with O'Reilly's policies (as outlined above) and in a non-discriminatory manner. *Affidavit of Emily Buchholz.* In fact, in District 109, from June 2003 to July 2005, a total of seven employees were separated from their employment because they could not perform the requirements of their job and they were not eligible for a leave of absence - four of these employees were male. *Id.* Buchholz did not decide to terminate Bell because she was pregnant or for any reason related to her gender. *Id.*

Though Bell claims that McClenny told her she was being terminated because of her "condition ... because [she was] pregnant," she admits that "Human Resources" gave the directive to terminate her (in other words, it was not McClenny's decision) and there is no evidence that Buchholz or anyone else in Corporate Team Member Relations told McClenny that Bell was being terminated because she was pregnant. *Andrea Bell Deposition* at page 99, lines

20-23; page 100, lines 1-23; page 101, lines 1-2.  Bell admits that other than McClenny, no one

ever told her that she was being terminated because of her pregnancy.  *Id.* at page 102, lines 17-

20.

After being informed of her termination, Bell did not call Corporate Team Member

Relations to discuss her termination.  *Andrea Bell Deposition* at page 101, lines 3-5.  Rather, Bell

contends that McClenny called Golden, who said "he couldn't do" anything about the fact that

she was being terminated.  *Id.* at page 75, lines 10-13.  Yet, Golden never indicated to anyone

that Bell was terminated because she was pregnant or for any reason related to her gender,

indeed he understood that Bell was terminated because she could not perform her job and was

not eligible for a leave of absence.  *Id.* at page 99, lines 1-19; *Affidavit of Dolan E. Golden, Jr.*

Notably, Bell, who was pregnant when O'Reilly hired her, acknowledges that O'Reilly

could have terminated her when she was issued a speeding ticket during her ninety-day

probationary period.  *Andrea Bell Deposition* at page 65, lines 2-8.  However, O'Reilly merely

issued her a written disciplinary violation, even though she thought O'Reilly would have fired

her.  *Id.* at page 67, lines 1-19; Exhibit 3. Additionally, by Bell's own admission, O'Reilly

employed other pregnant employees, including Jones and another "girl" who was "late

pregnant," who were not terminated.  *Id.* at page 104, lines 7-23.

Bell filed this lawsuit against O'Reilly alleging that O'Reilly terminated her "because of

her sex, female, and her sexual status, pregnant, in violation of the Pregnancy Discrimination

Act."  *Compl.* at ¶ 23.


## II.    Summary Judgment Standard

Summary  judgment  is  appropriate  "if  the  pleadings,  depositions,  answers  to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(c).  After adequate time for discovery, summary judgment is mandatory against the party failing to show the existence of an element essential to proof of its case at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Further, "substantive law will identify which facts are material," and the trial judge, ruling on a summary judgment motion, must evaluate the evidence presented by the substantive burden.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 254 (1986).  The party moving for summary judgment has the burden of establishing the absence of genuine issues of material fact.  *Id.* at 256; *Florida Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d 1313, 1318 (11th Cir. 1990).

When a motion for summary judgment has been made properly, the non-moving party may not rely solely on the pleadings, but must show by affidavits, depositions, answers to interrogatories, and admissions that there are specific facts demonstrating that there is a genuine issue for trial.  *Fed. R. Civ. P.* 56(e); *Celotex*, 477 U.S. at 324.  Although any factual inferences must be viewed favorably toward the non-moving party, he/she does not escape the essential burden under the summary judgment standard of establishing that there is a genuine issue as to a material fact in order to avert summary judgment.  *See Matushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 577 (1986); *Haynes v. Kerner*, 404 U.S. 519, 520 (1972); *Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988); *Jackson v. Reese*, 608 F.2d 159, 160 (5th Cir. 1979).

## III.    Argument

The Pregnancy Discrimination Act ("PDA") clarifies that gender discrimination in violation of Title VII includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k). *See also International Union, United Auto., Aerospace & Agr. Implement Workers of America, UAW v. Johnson Controls, Inc.,* 499 U.S. 187, 198-99 (1991) (quoting 42 U.S.C. § 2000e(k)); *Armindo v. Padlocker, Inc.*, 209 F.3d 1319, 1320 (11th Cir. 2000) (same). "The [PDA] has now made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex." *Newport News Shipbuilding & Dry Dock Co. v. EEOC,* 462 U.S. 669, 684 (1983).

The PDA does not, however, afford pregnant women or women affected by childbirth or related medical conditions the right to any *favorable* treatment in the workplace. *International Union*, 499 U.S. at 210. They merely must be "treated the same" as similarly-situated non-pregnant employees or employees who are not affected by childbirth or related medical conditions. 42 U.S.C. § 2000e(k). *See also Armindo*, 209 F.3d at 1320 (quoting 42 U.S.C. § 2000e(k)). When enacting the PDA amendment to Title VII, Congress made the "decision to forbid special treatment of pregnancy despite the social costs associated therewith." *International Union*, 499 U.S. at 210. *Accord Sussman v. Salem, Saxon & Nielsen, P.A.,* 153 F.R.D. 689, 692-93 (M.D. Fla. 1994) ("This Court recognizes the Supreme Court's opinion [in *International Union*] that the [PDA] was not intended to provide accommodations to pregnant employees when such accommodations rise to the level of preferential treatment. To require an employer to make reasonable accommodations for a pregnant employee is to require the employer to relinquish virtually all control over employees once they do become pregnant.").

Analysis of a pregnancy discrimination claim is accomplished in the same manner as the analysis of any other Title VII gender discrimination claim. *Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1312-13 (11th Cir. 1994); *Armindo*, 209 F.3d at 1320. Although employment discrimination may take one of two "forms" under Title VII - "disparate treatment" or "disparate impact" - Bell's claim is one of disparate treatment, *i.e.*, that she received disparate treatment because of her pregnancy which resulted in an adverse employment action against her. *See generally Compl.*

> [Claims of disparate treatment occur where] [t]he employer simply treats some people less favorably that others because of their race, color, religion, sex or national original. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.

*International Bhd. of Teamsters v. United States*, 431 U.S. 324, 335-36 n.15 (1977) (citations omitted).

Accordingly, Bell must establish that O'Reilly intentionally discriminated against her *because of* her pregnancy. *See Armstrong*, 33 F.3d at 1313. To do so, she may present circumstantial or direct evidence of intentional discrimination. *Id.* Under either evidential theory, however, Bell cannot establish that O'Reilly violated the PDA, and therefore, O'Reilly is entitled to an entry of summary judgment in its favor.

## A.    Bell Has Insufficient Direct Evidence of Pregnancy Discrimination.

Under Title VII jurisprudence in the Eleventh Circuit, direct evidence of intentional discrimination is seldom found. *Standifer v. Sonic-Williams Motors, L.L.C.*, 401 F. Supp. 2d 1205, 1215 (N.D. Ala. 2005) (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1537 (11th Cir. 1997); *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 595 (11th Cir. 1987). Direct evidence has been defined as "[s]uch evidence [which], if believed, proves the existence of a fact in issue without inference or presumption," *Burns v. Gadsden State Community College*, 908 F.2d 1512,

1519 (11th Cir. 1990); or "evidence . . . composed of only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of some impermissible factor." *Rojas v. Florida*, 285 F.3d 1339, 1342 n.2 (11th Cir. 2002) (citations omitted)). *Accord Schoenfeld v. Babbitt*, 168 F.3d 1257, 1266 (11th Cir. 1999). Direct evidence of intentional discrimination is not found, however, where otherwise allegedly discriminatory remarks are made by someone other than the decisionmaker. *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989). *Accord EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir. 1990) (quoting *Price Waterhouse, supra*); *Standifer*, 401 F. Supp. 2d at 1215 (same).

The decision to terminate Bell was exclusively that of Buchholz, made in accordance with O'Reilly's policies (as outlined above) and in a non-discriminatory manner. Neither McClenny nor Golden nor anyone else had any involvement whatsoever in making the decision to terminate Bell. **Indeed, Bell admits that shortly after her conversation with Enloe, "the Human Resources lady" gave McClenny the directive to terminate Bell.** Yet, there is no allegation that Buchholz told Bell that she was being terminated because she was pregnant. To the contrary – Buchholz did not decide to terminate Bell because she was pregnant or for any reason related to her gender.

Though Bell claims that McClenny told her she was being terminated because of her "condition . . because [she was] pregnant," since he was not the decisionmaker, his statement is not direct evidence of pregnancy discrimination. *Price Waterhouse, supra; Alton Packaging, Corp., supra; Standifer, supra*. Even if his statement could be considered in support of her claim, there is no evidence that Buchholz or anyone else in Corporate Team Member Relations *told* McClenny to terminate Bell because of her pregnancy. Bell did not even call Corporate Team Member Relations to discuss her termination, and Bell admits that other than McClenny,

no one ever told her that she was being terminated because of her pregnancy. Additionally, even if Bell offers in support of her claim Golden's statement that "he couldn't do" anything about the fact that she was being terminated, in addition to the fact that Golden was not the decisionmaker, he never indicated to anyone that Bell was terminated because she was pregnant or for any reason related to her gender; in fact, he understood that Bell was terminated because she could not perform her job and was not eligible for a leave of absence.

As Bell cannot demonstrate any direct evidence of pregnancy discrimination, she must prove her claim under a circumstantial evidence theory, which she cannot do.

**B.    Bell Has Insufficient Circumstantial Evidence of Pregnancy Discrimination.**

**1.    Bell Cannot Demonstrate a Prima Facie Case of Pregnancy Discrimination.**

Under Eleventh Circuit Title VII precedent, "[t]he first step in a claim of disparate treatment, based on a theory of 'pretext' and supported by circumstantial evidence," is for Bell to demonstrate a *prima facie* case of pregnancy discrimination. *Armstrong*, 33 F.3d at 1313. To demonstrate a *prima facie* case of pregnancy discrimination, Bell must that (1) she is a member of a protected group, (2) she was qualified for her position, (3) she suffered an adverse employment action, and (4) suffered from differential application of work or disciplinary rules. *Id.* at 1314. *Accord Spivey v. Beverly Enterprises, Inc.*, 196 F.3d 1309, 1312 (11th Cir. 1999); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984) (noting a *prima facie* case of discrimination arises where the plaintiff "is a member of a protected class, that [she] was qualified for the job from which [she] was fired, and that the misconduct for which [she] was discharged was nearly identical to that engaged in by (an employee) outside the protected class whom (the employer) retained").

O'Reilly does not dispute the first (that Bell was a pregnant employee) and third (that Bell suffered an adverse employment action when she was terminated) elements of Bell's *prima facie* case. However, she cannot demonstrate that she was qualified for her position or suffered from differential application of work or disciplinary rules.

There can be no dispute whatsoever that once the lifting restriction was imposed by her physician, Bell was no longer qualified for her position as Delivery Specialist. Bell was qualified only if she met "the criteria that the employer has articulated for the position." *Ferrell v. Masland Carpets, Inc.*, 97 F. Supp. 2d 1114, 1124 (S.D. Ala. 2000). In *Spivey*, a PDA case, the Eleventh Circuit definitely held that a pregnant nurse's assistant whose responsibilities including lifting and repositioning patients was not qualified for her position because she had a twenty-five pound physician-imposed lifting restriction. 196 F.3d at 1312. The nurse's assistant argued that the employer should have accommodated her by giving her modified work. *Id.* Although the employer had a policy providing that employees injured on the job would be given modified work duties, the Court said that the employer had no obligation to extend that policy to pregnant employees or any other employees who were not injured on the job. *Id.*

Likewise, in *Armstrong*, the Eleventh Circuit rejected a pregnant nurse's argument that when she refused to treat an HIV-positive patient because of concern for the safety of her fetus, her employer should have provided her with "alternative work." Similarly, in *McQueen v. Airtrain Airways, Inc.,* 2005 WL 3591100 *1, * 4 (N.D. Fla., Dec. 30, 2005), a pregnant customer service agent under a physician-imposed twenty-five to thirty pound lifting restriction was deemed unqualified for her position because it required her to be able to lift up to seventy pounds. The Court noted that the employer was not required to ignore the restriction because to do so "would trap employers between the Scylla of liability for following medical advice and the

Charybdis of different liability for ignoring the same." *Id.* (quoting *Staszak v. Kimberly-Clark Corp.*, 2002 U.S. Dist. LEXIS 14882 *1, *14 (N.D. Ill., Nov. 18, 2002)).  In its holding, the Court concluded that the customer service agent who was "required to lift up to seventy pounds as part of her stated job requirements and because her physician drafted a letter which essentially restricted her lifting capabilities to thirty pounds or less, [the employee] was no longer qualified to work as [a] . . . customer service agent during her pregnancy." *Id.*  As in *Spivey* and *Armstrong*, the Court also rejected the employee's argument that the employer should have offered her a modified work assignment with less rigorous lifting requirements. *Id.* at *5.

Clearly, as with the employees in *Spivey*, *Armstrong*, and *McQueen* and pursuant to the *indisputable* terms of her Delivery Specialist job description, Bell was not qualified for her position as a result of her restriction, which O'Reilly had no duty to ignore.  *See also Sermons v. Fleetwood Homes of Georgia*, 227 F. Supp. 2d 1368, 1380 (S.D. Ga. 2002) ("[Plaintiff] admits that she could not perform all of her own job functions by herself.  Hence, she was not qualified to do the access panel installer job.").  O'Reilly was not obligated to accommodate Bell's restriction, unless O'Reilly was accommodating other similarly-situated non-pregnant employees' restrictions, of which there is no evidence whatsoever.  *See International Union*, *supra; Armindo*, *supra*; *Sussman, supra.*  Thus, any claim That O'Reilly should have accommodated Bell's work restriction is without merit.[4]  *See Spivey, supra; Armstrong, supra; McQueen, supra.*  Bell was not qualified for her position as a result of the lifting restriction, and thus she cannot establish a *prima facie* case of pregnancy discrimination, thereby entitling O'Reilly to an entry of summary judgment in its favor.

---

[4] It is critical to note that even if O'Reilly had accommodated Bell's work restriction, which it is not required to do, it is not a foregone conclusion that if she had continued working she even would have been entitled to a leave of absence when she delivered her baby – her baby was born on July 22, 2005, *Andrea Bell Deposition* at page 116, lines 22-23; page 117, line 1, at which time Bell would have only been employed with O'Reilly for approximately five months had she continued her employment therewith.

Even more so, Bell cannot demonstrate that she suffered from a differential application of O'Reilly's work rules. "[A]n employer violates the PDA when it denies a pregnant employee a benefit generally available to temporarily disabled workers holding similar job positions." *Spivey*, 196 F.3d at 1313 (citing *Byrd v. Lakeshore Hosp.*, 30 F.3d 1380 (11th Cir. 1994)). O'Reilly's Work Restriction Policy allows it to determine whether an employee with a work restriction should be placed in a leave of absence status or whether O'Reilly can accommodate the restriction on a short-term basis. Although it has the right to do so under its policy, Bell cannot demonstrate that O'Reilly actually afforded other similarly-situated non-pregnant employees work accommodations. *See International Union, supra; Armindo, supra; Sussman, supra.* Moreover, Bell cannot demonstrate that O'Reilly afforded leaves of absence to other similarly-situated non-pregnant employees who could not perform their job duties and were not eligible for a leave of absence. In fact, the only evidence is to the contrary – from June 2003 to July 2005, O'Reilly terminated seven employees, four of whom were male, because they could not perform the requirements of their job and were not eligible for a leave of absence.

In short, under the PDA, an employer must "ignore an employee's pregnancy and treat her 'as well as it would have if she were not pregnant.'" *Spivey,* 196 F.3d at 1313 (quoting *Piraino v. Int'l Orientation Resources, Inc.*, 84 F.3d 270, 274 (7th Cir. 1996)). Ignoring Bell's pregnancy still would have left O'Reilly with an employee who could not perform her job duties and was not eligible for a leave of absence. *Id.* ("Ignoring Appellant's pregnancy would still have left Appellee with an employee who suffered from a non-occupational injury."); *McQueen*, 2005 WL 3591100 at *5 ("Ignoring McQueen's pregnancy, McQueen was an AirTran employee with a physician-imposed lifting restriction."). Bell cannot offer any comparison of similarly-situated non-pregnant employees who were treated more

favorably than she with respect to an accommodated work restriction or a leave of absence. Bell fails to demonstrate the fourth element of her *prima facie* case of pregnancy discrimination, thereby entitling O'Reilly to an entry of summary judgment in its favor.

### 2.    O'Reilly Articulates a Legitimate, Non-Discriminatory Reason for Bell's Termination.

Assuming *arguendo* that Bell can demonstrate a *prima facie* case of pregnancy discrimination, the burden shifts to O'Reilly to offer a legitimate, non-discriminatory reason for Bell's termination. *Armstrong*, 33 F.3d at 1313. O'Reilly "need not persuade the [C]ourt that it was actually motivated by the proffered reasons." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981). Rather, it merely must *articulate* a legitimate, non-discriminatory reason for Bell's termination. *Id.* This burden is "exceedingly light." *Perryman v. Johnson Products Co., Inc.,* 698 F.2d 1138, 1142 (11th Cir. 1983). O'Reilly's burden is "merely one of *production*, not of proof." *Lee v. Russell County Bd. of Education*, 684 F.2d 769, 773 (11th Cir. 1982).

As Bell's position with O'Reilly was a Delivery Specialist, which required her to carry and lift between twenty-six to fifty pounds one to two hours per day and between fifty-one to seventy-five pounds one to two hours per day, Buchholz became aware that Bell could not perform all of the requirements of her position because of her restriction. In accordance with O'Reilly's Work Restriction Policy, Buchholz had to determine whether Bell could be placed in a leave of absence status, or whether O'Reilly could accommodate her restrictions. Buchholz determined that it was unreasonable for O'Reilly to accommodate Bell's restriction because when other O'Reilly employees had to assist Bell to perform her job duties, those employees were having to perform her job duties, in addition to their own, which could create a significant

hardship on the store and on the other Store No. 1126 employees. Buchholz decided, therefore, that Bell would need to be placed in a leave of absence status but unfortunately, she was not eligible for a leave of absence under the Family and Medical Leave Act or under any of O'Reilly's leave of absence policies due to the fact that she had only been employed with O'Reilly for approximately four months. As such, Buchholz directed McClenny to separate Ms. Bell from employment with O'Reilly.

The Northern District of Florida's statements in *McQueen* are instructive in this regard:

Here, Air Tran has satisfied its burden of articulating a legitimate, nondiscriminatory reason for placing McQueen on leave. Air Tran argues that it placed McQueen on leave because the physician's instructions limiting McQueen's lifting capabilities during her pregnancy were indefinite in duration and placed AirTran in the impossible position of indefinitely insuring that there was always another employee present with Plaintiff whenever the situation arose requiring her to lift more than 30 pounds. Such a burden, according to AirTran, could jeopardize the Company's ability to effectively and safely maintain its operations.

The Court finds that AirTran's explanation satisfies its "exceedingly light" burden or producing a legitimate, nondiscriminatory reason for its actions. AirTran's explanation is legitimate and nondiscriminatory because AirTran, as a commercial airline, is in the business of safely transporting customers and their luggage. In order to meet its business obligations, AirTran must be able to lift the luggage of passengers so that it may effectively screen and transport the luggage. AirTran hires customer service agents to perform these lifting duties. The customer service agents are required to have the ability to lift up to seventy pounds on a repetitive basis. This requirement is stated in the job description of a customer service agent. When a customer service agent, like McQueen, presents a physician's note to AirTran recommending that she not lift more than thirty pounds, AirTran is placed in a difficult situation. If AirTran accommodates McQueen, AirTran's business operations are jeopardized. If AirTran places McQueen on leave, it subjects itself to lawsuits such as this one. . .

2005 WL 3591100 at *9-10 (internal quotation marks omitted)). The dilemma O'Reilly faced in the present case is extremely similar to that AirTran faced in *McQueen*. Undoubtedly, O'Reilly has articulated a legitimate, non-discriminatory reason for Bell's termination.

**3.    Bell Cannot Demonstrate that O'Reilly's Proffered Legitimate, Non-Discriminatory Reason for Her Termination Was Pretextual.**

O'Reilly having demonstrated a legitimate, non-discriminatory reason for terminating Bell, the burden shifts back to Bell to demonstrate by a preponderance of the evidence that O'Reilly's proffered legitimate, non-discriminatory reason is pretextual, which she cannot do. *See Armstrong,* 33 F.3d at 1313-14. "[T]he presumption of discrimination falls and the burden of production again shifts to [Bell] to offer evidence sufficient for a reasonable jury to conclude that [O'Reilly's] supposedly legitimate reason is merely a pretext for illegal discrimination." *Standifer*, 401 F. Supp. 2d at 1216.

Bell cannot demonstrate that she was fired for any reason other than the fact that Buchholz, the decisionmaker, was informed that Bell could not perform her job requirements, and Bell was not eligible for a leave of absence.  Had O'Reilly been "looking" for a reason to terminate Bell, it could have done so when she was issued a speeding ticket during her 90-day probationary period.  **By Bell's own admission, Enloe informed her that if her baby was born after she had been employed with O'Reilly for six months, she could take a leave of absence and still be employed with O'Reilly.**  Giving effect to O'Reilly's policies, for example, Jones had just returned to her position at O'Reilly after taking maternity leave.

In addition, there is no evidence that O'Reilly treated similarly-situated non-pregnant employees more favorably under such circumstances by either accommodating their restrictions or providing them with leaves of absence before their eligibility dates.  Rather, the evidence is to the contrary – from June 2003 to July 2005, O'Reilly terminated seven employees, four of whom were male, because they could not perform the requirements of their job and were not eligible for a leave of absence.  *See Armindo*, 209 F.3d at 1320 (noting that the PDA "is not violated by an employer who fires an employee for excessive absences, even if those absences were the result

of the pregnancy, unless the employer overlooks the comparable absences of non-pregnant employees"). Although a plaintiff "need not identify specific non-pregnant individuals treated differently from her[] if the employer violated its own policy in terminating her," *Id*., there is no indication that O'Reilly violated any of its policies when terminating Bell. Bell's termination was effected by Buchholz, pursuant to O'Reilly's Pregnancy Policy, Work Restriction Policy, Personal Leave of Absence Policy, and FMLA Policy.

Bell cannot demonstrate that O'Reilly's proffered legitimate, non-discriminatory reason for her termination was pretextual, hence O'Reilly is entitled to an entry of summary judgment in its favor.

## IV.    Conclusion

For the foregoing reasons, O'Reilly respectfully requests this Court enter summary judgment in its favor.

Respectfully submitted,

**/s/ H. William Wasden**
H. WILLIAM WASDEN    (WASDH4276)
hww@bowronlatta.com
KRISTIN T. ASHWORTH    (ASHWK4318)
kta@bowronlatta.com
Attorneys for O'Reilly Automotive, Inc.

OF COUNSEL:

BOWRON, LATTA & WASDEN, P.C.

Post Office Box 16046
Mobile, Alabama  36616
Telephone: (251) 344-5151
Facsimile:  (251) 344-9696


### CERTIFICATE OF SERVICE

I hereby certify that I have on this the 5th day of February, 2007 served a copy of the foregoing pleading upon counsel as provided below through this Court's CM/ECF system which will provide notification as follows:

j-lewis@jaylewislaw.com

**/s/ Kristin T. Ashworth**