ANDREA DANITA BELL

**EXHIBIT B**

1        IN THE UNITED STATES DISTRICT COURT

2           MIDDLE DISTRICT OF ALABAMA

3              NORTHERN DIVISION

4   CASE NO.:  2:06-cv-00223-SRW        **ORIGINAL**

5

6   ANDREA BELL,

7           Plaintiff,

8               V.

9   O'REILLY AUTOMOTIVE, INC.,

10          Defendant.

11

12

13

14        S T I P U L A T I O N S

15

16

17        IT IS STIPULATED AND AGREED by and

18   between the parties, through their respective

19   counsel, that the deposition of ANDREA DANITA

20   BELL may be taken before STACEY L. JOHNSON,

21   Commissioner, at the Offices of Jay Lewis, LLC,

22   847 S. McDonough Street, Suite 100, Montgomery,

23   Alabama, on the 8th day of September, 2006.

**ANDREA DANITA BELL**

1    Q    Was there anyone else that you
2    interviewed with?
3    A    No.
4    Q    When you were ultimately offered the
5    position, who made the offer to you?
6    A    He did.
7    Q    Did he make you the offer the day that
8    you had the interview?
9    A    Yes.  He told me six-fifty, but I ended
10    up...
11    Q    You ended up making six seventy-five;
12    is that right?
13    A    Right.
14    Q    Okay.
15    A    Also -- go ahead.
16    Q    Were you initially paid six-fifty and
17    you got a raise?
18    A    Huh-uh.  Paid six seventy-five.
19    Q    Okay.  And this was in February of '05;
20    is that right?
21    A    Right.
22    Q    Okay.  And you were pregnant at that
23    time; right?

ANDREA DANITA BELL

1    A    Right.

2    Q    Okay.  Did Louis -- did he know you

3  were pregnant?

4    A    I don't know.  I don't know.  But

5  everybody eventually found out because I told

6  Sean.

7    Q    Sean who?

8    A    Jackson.

9    Q    Was he a coworker?

10    A    Yes.  He was training me on the truck.

11    Q    Okay.  When did you tell him?

12    A    When I started.

13    Q    Right -- right up front?

14    A    Yeah.

15    Q    Okay.  Did you ever talk with anybody

16  in O'Reilly's Human Resources when you initially

17  became employed with O'Reilly?

18    A    Not about pregnancy.

19    Q    No.  I just mean about anything.

20    A    I talked to them about something.

21  Yeah, I talked to one of them.

22    Q    Do you remember who you spoke with?

23    A    No.  But I was talking about my check.

ANDREA DANITA BELL

1    delivery specialist at O'Reilly?

2        A    Yes.

3

4        (Whereupon, Defendant's Exhibit

5    Number 2 was marked for identification

6    and copy of same is attached hereto.)

7

8        Q    Okay.  I'll show you what says O'Reilly

9    Delivery Specialist Job Description.  If you

10   take a look at that, does that accurately

11   reflect what your job description was?

12       A    (Witness reviews document.)  Yeah.

13       Q    Okay.  Did you understand the lifting

14   requirements of your job when you were hired?

15       A    Yeah.  And I was lifting.

16       Q    And you were lifting -- how much were

17   you lifting?

18       A    I don't know the exact weight.  Like

19   batteries and stuff.

20       Q    Okay.  The job description outlines the

21   various different weights carried and weights

22   lifted.  Would you agree that --

23       A    I was fine with all of it.

ANDREA DANITA BELL

1      Q    Did you have any conversations with

2  Ernie personally?

3      A    He knew I was pregnant.

4      Q    Okay.  But did you talk with him about

5  Mr. Wordlaw's concerns?

6      A    No, not about that.  Later on -- later

7  on down the line he said that they was going to

8  take me off the truck and I was getting on the

9  counter.

10     Q    Okay.  Let's go back, though, a little

11 bit to -- when Mr. Wordlaw, you said, initially

12 found out you were pregnant --

13     A    Right.

14     Q    -- he had concerns about you lifting;

15 is that right?

16     A    Right.  So I had to get a doctor's

17 excuse.

18     Q    And he told you that Ernie directed him

19 to tell you to get a doctor's excuse?

20     A    Right.  So it could be in the file.

21     Q    Did you ever talk with Ernie about the

22 directive to get the doctor's excuse?

23     A    Not that I can recall.  I don't

ANDREA DANITA BELL

1  remember.

2      Q    Did you have any other conversations

3  with anybody at O'Reilly at that time about

4  Mr. Wordlaw telling you to go get a doctor --

5      A    Melissa.

6      Q    Now, who is Melissa?

7      A    Melissa Jones, the assistant manager.

8      Q    Of the same store?

9      A    At the time, she was.  She moved to

10  another store.

11     Q    Okay.  What was your conversation with

12  Melissa?

13     A    That I was going to get a doctor's

14  excuse.

15     Q    You told her that?

16     A    She said it was good that I was getting

17  a doctor's excuse that they'd have on file.

18     Q    Okay.

19     A    She was around.

20     Q    She was around.  What do you mean by

21  that?

22     A    When I was told to get a doctor's

23  excuse.

ANDREA DANITA BELL

1     Q     She overheard the conversation?

2     A     Right.

3     Q     Did anyone else overhear that

4  conversation?

5     A     No.

6     Q     Did you have --

7     A     Oh, what was his name?  He was blond

8  headed.  His name is on one of the lists around

9  here.  He was an assistant manager, too.

10    Q     Is it Easterling?

11    A     No.  He's a dude, a man.  Josh.

12    Q     Josh?

13    A     Josh.

14    Q     Okay.  You don't remember his last

15  name?

16    A     No.

17    Q     Okay.  You say he overheard the

18  conversation between you and Mr. Wordlaw?

19    A     He knew about it, too.

20    Q     He knew about the directive to get the

21  doctor's note?

22    A     Right.  Because they needed to know --

23  you know what I'm saying -- what I could lift.

**ANDREA DANITA BELL**

1    Q    Now, other than Josh overhearing that

2    conversation, did you and him ever talk about it

3    between the two of you?

4    A    No.

5    Q    Okay.  So Mr. Wordlaw -- after he told

6    you to get a doctor's excuse, tell me what you

7    did -- or a doctor's note, tell me what you did

8    next.

9    A    I got the doctor's note, brought it

10   back to him, and he put it on file.

11   Q    Okay.  Did you have any conversations

12   with him at that time that you gave him the

13   doctor's note?

14   A    No.  I just said it's back there on

15   your desk.

16   Q    Okay.  Did he say anything to you about

17   it, about the restrictions?

18   A    No.

19   Q    Okay.

20   A    I did have a conversation with

21   Mr. Tony.  He was at the store at the time, but

22   he transferred to another store.

23   Q    What was his position at the store?

ANDREA DANITA BELL

1    A    He was the manager.

2    Q    Okay.  What was your conversation with

3  Tony?

4    A    Because -- okay.  I had received a

5  speeding ticket, and I thought I was going to be

6  fired but he said, no, if they wanted you to

7  fire you for something, they could fire you

8  because you're pregnant.

9    Q    When did Tony tell you that?

10    A    Right after I got the speeding ticket.

11    Q    Okay.

12    A    So I had -- was worried about it a

13  little bit, but I didn't pay it no mind.  I

14  thought I was going to get fired for the

15  speeding ticket.

16    Q    What was his position at the time he

17  told you that?

18    A    He was the manager of the store.  He

19  was an assistant manager.  He was on Atlanta

20  Highway then.

21    Q    He was what?

22    A    On Atlanta Highway.

23    Q    He was at a different store?

ANDREA DANITA BELL

1      A    But he was at the same store with me --

2    you know what I'm saying -- but he was -- he was

3    back and forth.

4      Q    Did he leave the store you were at

5    before you did?

6      A    Yes.

7      Q    When did he leave?

8      A    I don't know.

9      Q    You left in June -- or tell me, when

10    did you leave O'Reilly?

11      A    In June.

12      Q    Of 2005?

13      A    Yes.

14      Q    So he left sometime between February

15    2005 and June 2005?

16      A    Yes.

17      Q    Okay.  What happened with the traffic

18    ticket?

19      A    I paid it.

20      Q    I mean -- I'm sorry.  Let me -- that

21    was a bad question on my part.

22            When you got the ticket, what

23    happened?  What did O'Reilly do?

ANDREA DANITA BELL

1    A    They wrote me up.

2    Q    Did they conference with you about it?

3    A    No.  Just wrote me up.

4    Q    Okay.  Did they issue you -- did they

5    say anything to you about future actions or

6    anything like that?

7    A    Just wrote me up.  I thought they was

8    going to fire me, but they just wrote me up.

9    Q    Why did you think they were going to

10   fire you?

11   A    Because I was within my ninety days.

12   Q    What was the ninety days?

13   A    What was the ninety days?

14   Q    What do you mean you were within your

15   ninety days?

16   A    Ninety days at a job.  You know, if you

17   do certain stuff, they can fire you without --

18   they just can fire you.  They don't really have

19   to -- you know what I'm saying?

20   Q    Was it a probation period?

21   A    Yes.  That's why I was surprised when

22   they fired me after my probation period.

23   Q    I'm sorry?

ANDREA DANITA BELL

1      Q     And then the other date was -- was that

2   signed by someone else on the 22nd?

3      A     James.

4      Q     James Wordlaw?

5      A     (Witness nods head.)

6      Q     Okay.  So what is your understanding of

7   O'Reilly's policy on when an employee gets a

8   write-up during his or her probation period?

9      A     What is my understanding?

10      Q     Right.

11      A     If they get so many, they get fired.

12      Q     Okay.  How many do they have to get?

13      A     I don't know.  I don't know.  Do you

14   know how many?

15      Q     I'm asking you.  If you don't know,

16   that's okay.

17      A     But that's the only one I had.

18      Q     Now, we talked about you going to the

19   doctor and getting a doctor's note?

20      A     Right.  In March.

21      Q     Is this the doctor's note?

22      A     It surely is.

23      Q     And can you tell me what restrictions

ANDREA DANITA BELL

1    it gives you?

2        A    Lifting no more than thirty pounds.

3        Q    Okay.  I'm going to mark this as

4    Defendant's Exhibit 4.

5        A    Mark the date, too.

6        Q    What date is it?

7        A    March the 10th.

8        Q    Okay.

9

10       (Whereupon, Defendant's Exhibit

11   Number 4 was marked for identification

12   and copy of same is attached hereto.)

13

14       Q    Now, did you -- after March 10th when

15   you obtained that doctor's note, how soon

16   thereafter did you give the note to Mr. Wordlaw?

17       A    The same day.

18       Q    The same day?

19       A    Yes.  The day I went to the doctor.

20       Q    Okay.

21       A    I gave one to my other employer, too.

22       Q    Who was that?

23       A    Domino's.

ANDREA DANITA BELL

1    terminated?

2        A    Yes.

3        Q    What did you come to understand that

4    day?

5        A    At the beginning, I had a conversation

6    with Melissa Jones.  She told me to call Human

7    Resources, and I did.  And so after that, I

8    talked to -- had a conversation with Chris.

9    That's when he told me I was fired.

10       Q    Okay.

11       A    And then he called Ernie, and Ernie

12   said he couldn't do nothing about it.  And then

13   I was fired.

14       Q    Okay.  I'm going to rewind a little bit

15   and go back to when Mr. Wordlaw was in the

16   O'Reilly store.

17            Are you aware of any conversations he

18   had with anybody else about your work-related

19   restrictions?

20       A    No.

21       Q    Okay.

22       A    Not that I know of.

23       Q    Do you know if he told anyone else

**ANDREA DANITA BELL**

1    your restrictions?

2        A    No.

3        Q    Okay.  Other than telling Mr. Wordlaw

4    about your restrictions, did you -- and your

5    coemployees that you discussed it with, was

6    there anyone else -- and Ernie.  I know we

7    talked about Ernie -- was there anyone else that

8    we haven't talked about today that you told

9    about your restrictions while Mr. Wordlaw was

10   your manager?

11       A    An employee?

12       Q    People employed with O'Reilly.

13       A    No, not that I know of.

14       Q    Okay.  Now, you told me just a minute

15   ago that when things were too heavy that someone

16   else would lift them; is that right?

17       A    Yes.

18       Q    Tell me about the -- kind of your daily

19   workday once you had the restrictions.

20       A    I was hard-headed sometimes.  I still

21   lifted some things that I wasn't supposed to

22   lift.  If it didn't seem heavy to me, I'd lift

23   it.  You know, I really can't tell what thirty

ANDREA DANITA BELL

1    pounds anyway is, so...

2        Q    Did you seek assistance from other

3    employees to help you?

4        A    Yes.

5        Q    Okay.  How often did that occur?

6        A    I don't know.

7        Q    Did it occur every day?

8        A    Maybe.

9        Q    Was it a frequent occurrence that you

10   had to ask for help to lift?

11       A    It depends.  Not really because they

12   didn't -- some of the customers, they wouldn't

13   like order a lot of big stuff all the time.

14   Sometimes just spark plugs and alternators and

15   stuff, and I could lift that.

16       Q    But --

17       A    Like the heavy stuff, yeah.

18       Q    How often were you lifting what you

19   consider heavy stuff?

20       A    At least three times a week.

21       Q    Okay.  And when the things were what

22   you consider heavy, would you ask for help on

23   those occasions?

ANDREA DANITA BELL

1    A    Sometimes it be in the truck before I

2    get there.

3    Q    Okay.  Did Mr. Wordlaw ever go out on

4    delivery runs with you to help you?

5    A    No.

6    Q    Never?

7    A    No.

8    Q    Okay.

9    A    He went one time, but he was testing

10   the truck at the same time.

11   Q    He was chasing the truck?

12   A    Testing the truck.

13   Q    Did any other employees ever have to go

14   with you on a delivery run specifically just to

15   help you?

16   A    No.

17   Q    So if you had to deliver a part that

18   was over thirty pounds, how would you move it?

19   A    The customer.

20   Q    The customer would move it?

21   A    Yes.

22   Q    Okay.

23   A    Sometimes I wouldn't ask.  They'd just

**ANDREA DANITA BELL**

```
 1      Q     Mr. Wordlaw, did he -- he left the
 2   store?
 3      A     (Witness nods head.)
 4      Q     Okay.
 5      A     Right.
 6      Q     And who came in in his place?
 7      A     Nobody right then.
 8      Q     Okay.
 9      A     Melissa was really -- took over the
10   store.
11      Q     Okay.  How long did she act as the
12   manager?
13      A     For a little while.  She --
14      Q     A week or a month or --
15      A     We thought that she was going to get
16   the store.
17      Q     Okay.
18            MR. NELMS:  She said how long did she.
19      A     I don't know.  About a couple of weeks,
20   I guess.
21      Q     Okay.  Now, during this time that
22   Melissa was acting as the manager, did you
23   continue to make your runs?
```

ANDREA DANITA BELL

1      A      Yes.

2      Q      Okay.  At that time, did you have

3  anyone go with you to help you with your runs?

4      A      No.

5      Q      Okay.  Were you having to ask people to

6  assist you when you were in the store with heavy

7  items on occasion?

8      A      Yes.

9      Q      Okay.  Now, when Mr. -- Chris

10  McClinney, when he came on as the store manager,

11  did you tell him about your restrictions

12  initially?

13      A      I guess so.  Yeah.

14      Q      When?

15      A      When he first came.

16      Q      Okay.  When was that conversation?

17      A      I don't know.  I don't remember.

18      Q      Okay.

19      A      But I didn't tell him about the

20  letter.  I assumed that -- the note.  I mean, I

21  told him that I had, you know, a doctor's note.

22  I told him twice.  The second time when he told

23  me I had to go get one.  But I told him it was

ANDREA DANITA BELL

1    to your due date?

2        A    Yeah.

3        Q    That's what he told you?

4        A    Yeah.

5        Q    Okay.  Did he talk with you about you

6    having to seek assistance from other employees

7    to lift?

8        A    No.

9        Q    He didn't talk to you about that?

10       A    No.  Because he would help, too.

11       Q    He would help you?

12       A    Yeah.

13       Q    Okay.  So sometimes if there was

14   something too heavy for you to lift, you'd ask

15   Mr. McClinney?

16       A    Most of the time I wouldn't have to

17   ask.  They'd just automatically do it.

18       Q    Okay.  But Mr. McClinney would

19   automatically help you if something looked too

20   heavy?

21       A    Yes.

22       Q    Okay.  So that was the first time you

23   told him about your restriction, right, was when

ANDREA DANITA BELL

1  you were discussing the -- that you were going

2  to be moved to the counter; correct?

3       A    Right.

4       Q    Okay.  When was the second time you

5  discussed it?

6       A    When I was fired.

7       Q    Okay.

8       A    He asked me to get a doctor's excuse,

9  and I told him there was already one in there.

10      Q    When did he ask you to get a doctor's

11  excuse?

12      A    When he fired me.

13      Q    Okay.  Let me go back.  When you

14  initially had the conversation about you moving

15  to the counter, okay -- and you told him that

16  you had restrictions; is that right?

17      A    Right.

18      Q    Okay.  Was there a directive at that

19  point to get a doctor's note?

20      A    (Witness shakes head.)

21      Q    No?

22      A    No.

23      Q    Okay.  So did you begin working at the

ANDREA DANITA BELL

1    counter?

2       A    I mean, I already was working --

3    helping on the counter throughout the whole

4    thing.  But I didn't get a register, no.  I

5    would help like look up parts and stuff, but

6    other than that, no.  Because I really didn't

7    get taken off the truck like they said I was

8    going to get taken off the truck.

9       Q    You were still continuing to work on

10   the truck?

11      A    Right.  I'm saying that's what they

12   hired Tatum for.  She was supposed to have been

13   taking my spot until I came back.  That's

14   exactly what they told me, when I came back.

15      Q    What did they tell you about Tatum?

16      A    That they were hiring her because I was

17   getting on the counter until I came back.

18      Q    Until you came back from where?

19      A    I guess maternity leave.

20      Q    Okay.  So they were going to put Tatum

21   in your position to fill that position while you

22   were out?

23      A    Right.

ANDREA DANITA BELL

1      Q     Okay.  She knew -- she understood

2  what --

3      A     And her sister, the other driver.

4      Q     What was her sister's name?

5      A     Lakesha.

6      Q     Okay.  That was Lakesha.

7            All right.  Now, at any point, did

8  Mr. McClinney advise you to call Human

9  Resources?

10     A     No.

11     Q     No?

12     A     No.  Melissa did.

13     Q     Okay.  Did you call Human Resources?

14     A     Yes.

15     Q     Why did Melissa tell you to call Human

16 Resources?

17     A     Because she was debating in her head

18 whether or not that -- about -- about the

19 maternity leave.

20     Q     What do you mean she was debating in

21 her head?  What do you mean by that?

22     A     Because she had just came from

23 maternity leave, and she didn't know how it

ANDREA DANITA BELL

1    worked.

2       Q     She had just returned from maternity

3    leave?

4       A     About two months ago before that

5    happened.

6       Q     So Melissa was -- okay.  Melissa, who

7    was acting as the store manager, had just

8    returned from --

9       A     She was assistant manager, yeah.

10      Q     She had just returned from maternity

11   leave.  What do you mean she didn't understand

12   how it worked?

13      A     With all types of people.  See how long

14   you been there or whatever she was saying.

15      Q     So Melissa suggested you call Human

16   Resources?

17      A     And I did.

18      Q     Okay.  Who did you talk with in Human

19   Resources?

20      A     Peggy, Patty, Pammy.  I don't know her

21   name.

22      Q     Okay.  What did you talk with that

23   person about?

**ANDREA DANITA BELL**

1      A    She asked me when I was having the

2  baby, and that was it.  Then I said -- I told

3  her when I was having the baby, and then she was

4  like -- well, I asked -- then she asked me when

5  I was planning on taking maternity leave, and I

6  told her about a time but I really didn't know.

7  So she was like, well, if you can hold off until

8  having the baby to a certain time -- make the

9  baby come a different time -- then you'll be all

10  right if you come back in forty-five days.  I

11  said, I can't make the baby stay in.  But I

12  would have been back within forty-five days.

13     Q    Okay.  What did she -- why did -- did

14  she explain to you what she meant by forty-five

15  days, what the forty-five-day provision was?

16     A    Had to be back within forty-five days.

17  I couldn't miss no more than forty-five days.

18     Q    Was there a reason why she wanted you

19  to hold off until a certain date to have your

20  baby?

21     A    She didn't really say.

22     Q    Okay.

23     A    I don't know.

ANDREA DANITA BELL

1    Q    Did you have any understanding about

2  the length of time you had to be employed at

3  O'Reilly to take a leave of absence?

4    A    She didn't even say that either.

5    Q    Okay.  But did you understand

6  anything -- did you know anything about the

7  leave of absence policies?

8    A    No.

9    Q    Okay.  So after your conversation with

10  this person in Human Resources, what did you do

11  next?

12    A    Nothing.  That's when Chris called me

13  in there.

14    Q    Okay.  Let me ask you this.  Did you

15  talk with anybody else -- did you tell anybody

16  else what your conversation was with the lady in

17  Human Resources?

18    A    Melissa.

19    Q    Okay.  Did you just recount the

20  conversation to Melissa?

21    A    Not all of it.

22    Q    Well, what did Melissa say about it,

23  about the conversation?  Did she say anything?

ANDREA DANITA BELL

1        A       Not -- I don't think so.  But I think

2    that's when the Human Resources lady called back

3    and told them to fire me, and that's when Chris

4    fired me.  And I said for what.  He said because

5    of your condition.

6        Q       Okay.  Now, when you talked with Human

7    Resources that day, did you tell that lady about

8    your restrictions?

9        A       No.

10       Q       Okay.  Now, you said that you and

11   Mr. McClinney had a second conversation about

12   your restrictions; right?

13       A       That was it.

14       Q       That was it.

15               Okay.  Did he ever tell you to get a

16   doctor's note?

17       A       Then.

18       Q       Then?

19       A       Then.  And I said why, it's already in

20   the drawer.  And he went in the file, and he

21   found it.

22       Q       And then what happened?

23       A       He called Ernie.

**ANDREA DANITA BELL**

1    Q    Okay.

2    A    And Ernie said he couldn't do nothing

3    about it.

4    Q    This was all the same say?

5    A    Yes.

6    Q    The same day?

7    A    Yes, the same day.

8    Q    Okay.  Now, were you involved in the

9    conversation between Mr. McClinney and Ernie?

10   A    Yes.

11   Q    Were you on the phone with them?

12   A    Yeah.  He had it on speaker phone.

13   Q    Speaker phone.  Tell me about that

14   conversation.

15   A    I can't really -- I don't really know

16   what they talked about.  I wasn't paying

17   attention or nothing like that because I was

18   crying at the time.  But I did hear the last

19   part.  He said he couldn't do nothing about it.

20   Q    Okay.  Tell me what your conversation

21   with Chris was before, I guess, you called

22   Ernie.

23   A    Before he called Ernie?

ANDREA DANITA BELL

1    Q    Before he called Ernie, what did Chris

2  tell you?

3    A    That I was going home.  I said for the

4  day.  He said no, they were firing me because of

5  my condition.

6    Q    Because of your condition?

7    A    That's right.

8    Q    What did you understand that to mean?

9    A    I said my condition.  He said because

10  you're pregnant.

11    Q    Who told him --

12    A    And that's when he went on and called

13  Ernie.

14    Q    Who did he tell you told him to fire

15  you?

16    A    Human Resources.

17    Q    Human Resources.

18        Anyone in particular in Human

19  Resources?

20    A    Peggy.  I think her name is Peggy.  I

21  seriously think her name is Peggy.  She might be

22  the one -- it might be Peggy.

23    Q    So Mr. McClinney told you that Human

ANDREA DANITA BELL

```
 1    Resources told him to fire you?
 2        A     Right.
 3        Q     Okay.  Did you call Human Resources
 4    after that?
 5        A     No.
 6        Q     Okay.  Did you understand -- strike
 7    that.
 8              Did you know anything about an FMLA
 9    leave policy at O'Reilly?
10        A     No.
11        Q     Now, what date were you hired?
12        A     February.
13        Q     And what date were you terminated?
14        A     June 29th.
15        Q     So did you work for O'Reilly about four
16    months, a little more than four months?
17        A     Yeah.
18        Q     Okay.
19
20        (Whereupon, a brief recess was had in
21    the proceeding.)
22
23    BY MS. ASHWORTH:
```

ANDREA DANITA BELL

1    Q    During that conversation on the speaker
2  phone, did Ernie say anything about why you were
3  being terminated?
4    A    He wasn't really talking to me.  He was
5  talking to Chris.
6    Q    But did he say anything about why you
7  were terminated?
8    A    No.  I told you I really don't know
9  what the conversation was until the last part
10 because I was crying to myself.
11   Q    Now, you said that Mr. McClinney told
12 you you were fired because of your condition?
13   A    Right.
14   Q    And you understood that to mean your
15 pregnancy?
16   A    Right.
17   Q    Did anyone else at O'Reilly tell you
18 you were being terminated because of your
19 pregnancy?
20   A    Well, not me per se.
21   Q    Tell me what you mean.
22   A    Melissa and Chris had a conversation
23 with Lakesha.  Lakesha had a conversation with

ANDREA DANITA BELL

```
1    when I went back to Georgia the first time.
2         Q    You talked with her then?
3         A    Yeah.  But I was on vacation.
4         Q    Okay.  Did you talk about -- you were
5    on vacation from where?
6         A    Stress.
7         Q    Okay.  I lost you.
8         A    Okay.  After I went on maternity leave
9    from Domino's, I went to Georgia to relieve my
10   stress.  I had to get away from Alabama for a
11   second.  And I had a conversation with Lakesha,
12   and she was telling me about this other girl in
13   the same situation I was but they didn't fire
14   her.  She was a delivery driver, too.  Well, I
15   don't know if she was a delivery driver or not,
16   but she was in the same situation I was.
17        Q    What do you mean --
18        A    But they didn't fire her.  She worked
19   in the Prattville store.
20        Q    What do you mean she was in the same
21   situation you were?
22        A    She was pregnant -- late pregnant --
23   and they didn't fire her.
```

ANDREA DANITA BELL

1    Q    And never heard anything else?

2    A    No.  I asked before I filled out the

3    application were they hiring.  And I wanted to

4    make sure before I went up there whether or

5    not -- I told them how far along I was.  They

6    said it didn't matter if you were pregnant or

7    not, just come on and fill the application out.

8    Q    And you did?

9    A    Yes.

10   Q    And then you never heard anything?

11   A    No.

12   Q    Did you ever inquire back with them?

13   A    Yes.

14   Q    What happened?

15   A    They told me to call back.

16   Q    Did you call back after that?

17   A    Yes.

18   Q    Same thing?

19   A    Yes.

20   Q    When did you finally stop calling?

21   A    After I went on maternity leave.

22   Q    Okay.  All right.  So when was your

23   baby born?

ANDREA DANITA BELL

1    A    July 22nd.

2    Q    July 22nd?

3    A    It was early.

4    Q    Okay.  And did you quit Domino's?

5    A    I went on maternity leave, and then I

6    quit Domino's after I had a visit.

7    Q    After you had a visit?

8    A    Yeah.

9    Q    A visit from who?

10   A    I went to Georgia.

11   Q    You were on maternity leave?

12   A    And I went to Georgia.

13   Q    So you originally had planned to go

14   back to Domino's?

15   A    Yes.

16   Q    And then you changed your mind?

17   A    Yes.

18   Q    And moved to Georgia?

19   A    Yes.

20   Q    And you said that your job in Georgia

21   came to you?

22   A    Yeah.

23   Q    While you were on maternity leave?

ANDREA DANITA BELL

1    A    She told me that if I could wait -- if
2  the baby could wait that I would have been there
3  for six months, I believe, if I waited until
4  almost my due date -- real due date -- August.
5  And then after that if I was back within
6  forty-five days, then I would still have my job.
7    Q    Okay.  And I believe you testified
8  earlier that you began working in February of
9  2005 with O'Reilly?
10   A    Yes.
11   Q    And you -- and your baby was born on
12  July 21, 2005?
13   A    22nd.
14   Q    22, 2005.  And what do you understand
15  your termination date or your last date of
16  employment with O'Reilly to be?
17   A    July 22nd.  Or August -- I don't know.
18   Q    What was the last day that you were an
19  employee with O'Reilly Auto Parts, to your
20  understanding?
21   A    June 29th.
22   Q    June 29th.  And I believe you testified
23  that Chris McClinney was your store manager the

ANDREA DANITA BELL

1      A     No.

2      Q     Okay.  Did you have any devices to

3  assist you in moving the parts that you traveled

4  with in your truck to the consumers?

5      A     No.

6      Q     Okay.  Were you given a back brace of

7  any type?

8      A     We did get a back brace.

9      Q     Okay.  Were you able to wear your back

10  brace?

11      A     No.  James said that he was going to

12  order me one because it wasn't big enough for my

13  stomach.

14      Q     Did you ever get one from James?

15      A     No.

16      Q     Okay.

17      A     I would sometimes use Arthur's because

18  he had a big stomach.

19      Q     Okay.  On a normal -- how many hours a

20  week were you working?

21      A     Forty plus sometimes.

22      Q     Okay.  So you got some overtime?

23      A     Sometimes, yeah.

ANDREA DANITA BELL

```
 1      A    No.  Every employee could go back

 2    there.

 3      Q    Okay.  That's not my question, though.

 4    Were there any employees who only worked in that

 5    area and did not work out in the retail section

 6    where the customers were?

 7      A    It used to be like that.

 8      Q    Well, what about in June 2005?

 9      A    In and out.  They was in and out.

10      Q    So the answer is no?

11      A    I guess you could say no.

12      Q    Okay.  So who would come and help you

13    to load?

14      A    The store manager.  That's what I was

15    saying.  He really was back there running --

16    over that part -- delivery part.

17      Q    So in June, it would have been Chris

18    McClinney; right?

19      A    Right.

20      Q    So he's the person that would have

21    loaded your truck for you?

22      A    Right.

23      Q    And are you saying that in June, every
```

ANDREA DANITA BELL

1    time your truck needed to be loaded, he was the

2    person that loaded your truck?

3        A    No.

4        Q    Okay.  Who else would assist?

5        A    Arthur.

6        Q    What was Arthur's responsibility in the

7    store?  Was he assistant manager or retail?

8    What did he do?

9        A    He was the counter person.  But they

10   was moving him up to work back there.  I forget

11   what it's called now.  But work back there.

12       Q    Was he an assistant manager?

13       A    He was supposed to have been one, but

14   that didn't happen.

15       Q    I really want to know what his title

16   was in June of 2005.

17       A    I can't really say because they kept

18   calling him a manager, but he didn't get it.

19       Q    All right.

20       A    But he was counter person, but he was

21   working back there with deliveries with us.

22       Q    Okay.  When there were items that were

23   so heavy that one person couldn't lift them

ANDREA DANITA BELL

1   Alabama State, what was your career plan?  What

2   would you hoped to have done then?

3        A    I don't know.  I was going...

4        Q    Do you think you would have continued

5   to work for O'Reilly?

6        A    I probably would have changed my major,

7   though.  I might have changed my major.  I

8   wanted to change my major, but...

9        Q    What would you have changed your major

10  to?

11       A    Business.

12       Q    To business?

13       A    Management.

14       Q    Do you know what you would have -- what

15  career path you would have chosen after that?

16       A    Stayed at O'Reilly and furthered my

17  career there.

18       Q    Okay.  Now, when you -- you talked

19  about Peggy that you spoke with in HR.  Is it

20  possible that her name was Heidi?  Does that

21  ring a bell?

22       A    It might have been Heidi.  I don't

23  know.  Peggy might have been in the payroll

ANDREA DANITA BELL

1    part.

2        Q    It could have been Heidi?  You're just

3    not sure one way or the other?

4        A    No.

5        Q    Were delivery drivers supposed to move

6    the parts for the customers?  Were you supposed

7    to take it off the back of the truck and deliver

8    it where the customer wanted it?

9        A    I guess.

10       Q    Okay.  Now, I understand that some of

11   the employees helped you lift certain things;

12   correct?

13       A    Right.

14       Q    And they helped you load the truck

15   sometimes, too; right?

16       A    Right.

17       Q    Were there any other ways that they

18   assisted you in your daily work?

19       A    (Witness shakes head.)

20            MR. NELMS:  Answer out loud.

21       A    No.

22       Q    Did any of the other delivery drivers

23   have a dolly or a handcart assigned to their

OR017 – 5/00



# CORRECTIVE ACTION DOCUMENTATION FORM

**Name:** (First & Last) Andrea D Bell    **Team Member #:** 92086    **Location:** # 1126

**PURPOSE:** This document is intended to provide you with notice that there is a deficiency or problem with your work performance and/or behavior that must receive your immediate attention. To avoid any misunderstandings, this matter is being discussed with you and brought to your attention. You are urged to ask questions and discuss this matter in detail with your supervisor to help assure all factors are brought to light and appropriately considered.

☑ **90-DAY TRAINING PERIOD – Notice of Performance Deficiencies**

☐ **CORRECTIVE ACTION:** (Only for team members who have passed their 90-Day Training Period.)
**Select One:**    1st Warning
    2nd Warning
    Decision Making Leave: (H.R. approval received From/Date: _____
    Discharge (Attach as documentation to the Termination Report Form. H.R. approval required.)
    Other (Please Specify: _____ )

**Statement Of Facts:** Andrea was Driving 60 miles in a 40 mile Speed Zone, She was Stopped and Received A ticket For deiving over The Speed Limit.

**Specific Plan For Improvement And Scheduled Follow-up:** Drive The Speed. Limit Stated For EACh Route AS DisCussed, FoR The Safety of yourself and other drivers.

**Team Member Response:** (To be completed by team member) _____

**NOTE:** Any further policy violations or job performance problems will lead to further disciplinary action, up to and including discharge.

**I have read this report:** Andrea Bell    **Date** 3/23/05
    Team member's signature

**I have discussed this with the team member:** _____    **Date** 3/23/05
    Supervisor's signature

Reviewed by H.R. Dept: _____    _____
    Initials    Date

**White Copy (Human Resources)**    **Yellow Copy (Manager File)**



DEFENDANT'S EXHIBIT

3

Bell v. O'Reilly
USDC Case No. 2:06-cv-00223-SRW
Defendant's Response to Request for Production
D00056

FROM :TM                    FAX NO. :              Jul. 08 200    Attachment F

## Henry G. Johnson, M.D., F.A.C.O.G.
### — OBSTETRICS AND GYNECOLOGY —

2601 Woodley Park Drive
Montgomery, Alabama 36116

OFFICE HOURS BY APPOINTMENT                      Phone (334) 288-3400

March 10, 2005

RE:  ANDREA BELL

To Whom It May Concern:

The above named individual is presently under my care for pregnancy.
Please do not allow Ms. Bell to do any heavy lifting more than 30lbs.

Thank you for your attention in this matter.  If you have any further
questions, please call the office at the above number.

Sincerely,

Henry G. Johnson, M.D.



DEFENDANT'S
EXHIBIT

4

Bell v. O'Reilly
USDC Case No. 2:06cv223-SRW
Defendant's Initial Disclosure Documents
D00005